5220061 WC Safeway Scaffolding Safeway Services Appellant by Christopher Drinkwine v. Illinois Workers' Compensation Comm'n Jeffrey Michael Henderson Appellee by Edward Unsell Mr. Drinkwine, you may proceed. May it please the court and good morning, counsel. Chris Drinkwine on behalf of the employer, Safeway Scaffolding Safeway Services, LLC. The commission's finding that Petitioner never intended to return to work is the linchpin of its decision because that finding supports the termination of temporary total disability, as well as the denial of maintenance and vocational rehabilitation benefits. Mr. Drinkwine, before you get too far into the merits of your argument, I'd like to ask a threshold question about our jurisdiction. In this case, as I understand it, the commission initially denied voc rehab. Is that correct? That's correct. And the circuit court reversed the commission and ordered voc rehab without specifying a vocational rehabilitation plan. Is that also correct? It is, John. Well, there's a long line of cases involving this panel, and holding that an order for voc rehab is not final until either the parties have agreed upon, or the commission has determined a rehabilitation plan, outlining the rehabilitation services to be performed. So how is the order, circuit court's order, final, giving us jurisdiction? Your Honor, we believe that it is final. However, I want to call the court's attention to my motion for clarification of jurisdiction that I filed at the outset of the appeal. If the panel, I'm not sure if the panel is aware of that motion. Because of the cases that you just referred to, Justice Hudson, we found that, just like you, that there's a question about this jurisdiction. And we filed the motion for clarification of jurisdiction, as has been a practice in the past. That's my understanding, anyway. Well, in light of the cases you just alluded to, how is the order final? Well, we took the position in the motion that the order was final because the commission's decision is distinguishable from the circuit court's decision. Obviously, as you're aware, this court reviews the decision of the commission, not the decision of the circuit court. And the circuit court had a standard Thomas remand. Well, wait a minute. Hold on, counsel. First of all, let's clarify two things. The circuit court didn't remand it to the commission to award voc rehab. It remanded it to the commission for voc rehab, if any. I'm reading from the judge's order. Second of all, the cases that we're talking about, dealing with the question of whether there's finality to an order when voc rehab is an issue, are all cases where it was the commission that sent it back for voc rehab and we said wasn't a final order. But the question here is not whether we review the circuit court's decision. The question here is whether the circuit court's order is a final order, because we only review final orders. So if inserting the N for voc rehab, if any, did that render the circuit court's order interlocutory? And if so, we have no jurisdiction to review it. That's the question. It is, Your Honor. And that was the reason for the motion. And when the court denied the motion... Well, did you in your motion do the analysis Justice Hoffman just provided you? If memory serves, Judge Holdredge, we did. Really? Okay. Frankly, we took the order denying it as an order of this court that it did have jurisdiction. And quite frankly, didn't prepare much on that issue. But you clearly, I would say, understand the analysis Justice Hoffman provided. And so how would you respond to that question? Well, that the vocational rehabilitation remand under the... I'm trying to remember the name of the case. Supreme Catering? Supreme Catering, yeah. In our case, the decision is different than Supreme Catering because the decision was final with respect to all issues, including vocational rehabilitation. Because the request for vocational rehabilitation was denied pursuant to the Euclid Beverage case based on the commission's linchpin finding that the petitioner never intended to return to work. In this case, you mean? That's correct. So your position is it's a final and appealable order because of that? That was our position in the motion, and it is today, Your Honor. Okay. Okay. Just so we're clear, and you do understand that even though jurisdiction was contested by Mr. Unsell, that has no effect on our ability to rule. I do understand, Your Honor. And that was the purpose of the motion, to avoid wasting resources if this court didn't have jurisdiction. Okay. Thank you. Any questions, further questions regarding that issue from the court? I have none. Okay. If you wish to proceed then to your issues. Thank you, Judge. The commission's finding that the petitioner never intended to return to work cannot be overturned unless it's against the manifest way to the evidence. Because the commission's finding is supported by facts in the record and was based on credibility determinations, the finding that petitioner never intended to return to work was not against the manifest way to the evidence, and the circuit court's judgment must be reversed and the commission's must be reinstated. On May 17th, 2019, Dr. Coyle, the petitioner's treating physician, authorized petitioner to return to work with a 20-pound lifting restriction. Safeway directed petitioner to return to work on June 10th for light duty, and he did not report to work that day. Petitioner did not contact Safeway to explain why he failed to report to work that day. He did not call and advise that his commute was four hours due to the ferry and bridge that he used being closed due to the flood. He did not advise with regard to a purported sitting restriction that prevented him from driving for that long, and he did not advise that in his view, the light duty job was a sham. Instead, on June 11th, petitioner contacted Dr. Coyle and requested a driving restriction. Dr. Coyle declined that request, and Safeway heard nothing from petitioner until petitioner's counsel emailed almost a month later on July the 3rd, and indicated that your weak offer of a job within restrictions is viewed as a sham. Now, counsel, interestingly enough, as I understand your position on appeal, you're now conceding that the light duty job offered by the employer was within his work restrictions and was not a sham, correct? That's right. It's never been a sham. There's no basis to conclude that it was a sham, and it was always legitimate. Okay. So, on July the 7th was when petitioner left the voicemail message for Safeway Safety Supervisor Pam Bragenburg, indicating that he was willing to return to work. However, on the advice of counsel, Ms. Bragenburg did not return the call because by then, petitioner's return to work status was in dispute. The floodwaters receded on July 8th, and the ferry and the bridge were put back into service, but petitioner still did not report to work on July 9th or July 10th, or any date thereafter. On July 10th, Safeway's counsel wrote petitioner's counsel advising that petitioner had failed to return to work on June 10th as directed, that the job was legitimate and was available from June 10th through July 10th, and that petitioner had no basis for TTD after June 9th. At the hearing before the arbitrator, the petitioner testified to three reasons why he didn't report to work on June 10th. Those were that the flood was four hours due to, or that the commute was four hours due to the flood, because of a purported driving restriction, or sitting restriction actually, that he couldn't sit for more than 30 minutes, and that in his situational experience, the job was a sham. The commission affirmed the arbitrator's determination that petitioner was entitled to TTD through July 8th, acknowledging that at the time the light duty offer was made in June, it would have been unduly burdensome for petitioner to travel to and from work. However, the commission specifically found as of July 9th, when the bridge and ferry were reopened, he could have made the trip, and that his view that the job was a sham was not a basis to refuse the light duty work. So what was wrong with that determination? How did the commission err with that determination? The commission didn't err with that determination, Your Honor. It was a reasonable determination based on the evidence and based on its factual findings. The commission decision to terminate TTD was based on its linchpin finding that petitioner never intended to return to work, and its finding that the voicemail message after the flood receded was an act entirely inconsistent with his own testimony that the job was a sham. And the commission's decision must be reinstated unless it was contrary to the manifest way to the evidence. And the decision is not contrary to the manifest way to the evidence unless no rational trier fact could find that he never intended to return to work. The commission made that finding based on several factual determinations and credibility determinations. One was the three varying reasons he gave for not showing up raised questions regarding his credibility. Another was he didn't explain why he thought the job in his situational experience was a sham during his testimony. Another was the finding by the commission that there was no sitting restriction in place in June, and there was no clinical reason why the petitioner could not drive to work. Another was that he was seeking retraining and had in fact applied for different work. And these factual findings and credibility determinations were the basis for the commission's conclusion that the voicemail message was not a genuine effort to return for light duty work. So based on these factual findings and credibility determinations, the commission as the ultimate decision maker in a worker's compensation case, determined that petitioner never intended to return to work. That determination was not against the manifest way to the evidence because it was supported by facts in the record. The opposite conclusion was not clearly apparent. And it cannot be said that no rational trier effect could have the commission. As a result, the termination of TTD benefits was warranted under the precedent gallantine cases cited by the commission. Well, I think opposing counsel made, or maybe it was the circuit court, made some observation about the TTD going beyond the necessary period if you're, if your position is correct, and that it would be that your position is wrong. I understand your question, Your Honor. And Safeway has stressed that ordering TTD through July 8th for the period from June the 10th through July 8th does not make the commission's determination that petitioner never intended to return to work against the manifest way to the evidence. And there's two reasons for that. Although the conclusion that he never intended to return to work would appear to obviate the need to order TTD for that period, Safeway did not ask the commission to review the arbitrator's decision to order TTD between those dates. And as a result, that issue was not considered by the commission. It was not raised in our exceptions. Also, the finding that a light duty job was not available during the flood only means that petitioner could not have reported for work if he wanted to. The unavailability of the light duty job between those dates does not mean that the commission believed the petitioner intended to return to work for the employer in June, in July, or at any other point. Nor does the unavailability of the light duty job during the flood alter the commission's factual finding that petitioner's voicemail message expressing interest in returning to work was insincere and not genuine. So the Safeway's position is that it didn't ask that that be reviewed, and that had it done so, that would be the order of the commission that's against the manifest way to the evidence. But that's not an issue with respect to this appeal, and the court doesn't need to concern itself with that from Safeway's viewpoint. The dissenting commissioner, in this case, merely had a different interpretation of the evidence than did the majority of the commission. But that different... Would you finish up, Mr. Drinkwine? The red light's on. You will have time in reply. Thank you, Judge. The alternate determination by the dissenting commissioner does not render the majority's interpretation of the same evidence contrary to the manifest way to the evidence. Thank you. You'll have time in reply. Thank you. Mr. Unsel, you may respond. May it please the court, Eddie Unsel, on behalf of Jeff Henderson, Mr. Drinkwine. It's interesting. First of all, counsel calls it a linchpin, and that is the determination of the commission that he never intended. Well, as Commissioner Parker and the circuit clerk pointed out, circuit court, I'm sorry, pointed out, it's irrelevant. What the commission found, and Respondent probably should have brought that before the issue, the commission found that it was impossible, unavailable, untenable for a petitioner to return to work during the time period specified. The emails speak for themselves. An email was sent directing the petitioner to show up at a time where light duty was alleged available. He was giving four days notice, maybe three days notice, and was directed to show up at a time when it was factually determined that it was impossible. At the same time, he was requested or demanded that if he had questions and clarification to contact the safety director. Immediately before the impediment was removed, which was the flood, he contacted and she acknowledged that. Now, the testimony was different. He had stated that he had called a few times. She disagreed with that or did not respond to it, but her testimony was specific. Yes, I did receive a voicemail. Yes, I asked if I should return it. No, I was instructed not to. In my argument to the commission, that is what I argued. I said that that was a gotcha moment. The reason is everyone knew what the injuries were. The accident was not disputed. The fact that we're here, the fact that we are here in the appellate court on a case where it was a clear accident, none of the physicians were chosen by the petitioner. It was an eight and a half hour complex surgery. The treating physician who admitted by the employer was their choice had to seek help. They not only did an anterior but a posterior approach. It took eight and a half hours. Everyone knew this. It was understood, I believe, and certainly implied based upon my 44 years of practicing workers' comp law that he would not be able to return to his normal heavy duty job. To say that he never intended, that's probably true. He never intended on going back to this type of work, but did he never intend to work? That's not true. Mr. Ronsel, if I could ask you a question. The issues that you're raising are connected up to commission's obligation and role in assessing the credibility of the witnesses and the weight to be given to their testimony. Yes, sir. I guess the question would be, how do you respond to the argument that in this case the circuit court merely substituted his judgment for that of the commission on those issues? I did it in my brief, your honor. I said he did not. He made no factual determination. The commission found that it was impossible, certainly by implication, that he could not have returned to work on June the 10th. Clearly, they extended it to July the 9th after the flood receded and travel between those counties were available. If you take a look at the testimony from safety director Brandenburg, she testified that she lives in the same county. She says yes, it was impossible. It would have been a four-hour trip one way. We're talking Calhoun County? Yes, sir. Okay. Yes, sir. Calhoun County. There was the Campsville Ferry and the Hardin Bridge. That was the only available and they both were closed for almost a month. So, those were the facts. He didn't have to interpret anything. Facts were, a job offer was offered. Three days notice, show up on the 10th. It is within your restrictions. If you need any clarification, please call. Well, there was nothing in the email that said what the job was. There was nothing in the email that said where he was to report. There was nothing in the email that said what his duties were. So, he did call. He called before the impediment was removed. He testified that the word came out that the ferry was going to start running and that the bridge was going to be open. Never was there a job offer reinstated. In fact, she refused to call because of what I said before. Counsel, this was a very serious case. They knew that it was probably, well, based on his age, it wasn't going to be a permanent total, but it was a very serious injury and it was the start of it. Well, we're going to get him back to something and it's the same old song and dance. So, yes, that's why he thought it was a sham, but no one, he never gave it intention that he wasn't going to do it. He didn't like it. Now, let's talk about the restriction. Dr. Coyle put the resitting restriction at the outset. Yes, he refused to give a driving restriction, even though you have to sit when you drive, because he said, I do not give that unless they're driving for a vocation, unless that is part of their job duties. I guess like a FedEx driver or something. He was adamant about that and he didn't, but there was a 30-minute restriction. And if you look at this, this gentleman, this petitioner did more. He walked more. He stood more. He quit smoking. He did everything exemplary. He never couldn't find an objective. I have trouble sitting. I'm doing everything else that you said. So, this was a highly motivated petitioner. He did contact other places to work. He's working now, but the fact showed there was no one that altered the facts. The circuit court just said, look, I'm stuck with these facts. The facts are one, a job offer was made. It was impossible for him to comply. The arbitrator ruled that it was impossible, as did the commission by reinstating that. And fact, counsel at the circuit court hearing argued, his argument was that it wasn't untenable. He argued that it was a gift. Well, those extra days was a gift. He made light of it. And that's referenced in the circuit court's order. I believe the more reasoned dissent, I mean, the more reasoned opinion, it was based on commissioner Parker's dissent very quickly. With respect to the counsel. Sorry. Yes, sir. I have two questions. Yes, sir. First of all, you say that the trial courts did not reweigh the evidence, but he certainly did. He made an unreasonable and inexplicably found the physiatrist, Dr. Wing, who never performed diffusion surgery to be more credible than Dr. Coyne, who was an orthopedic physician who performed positional surgery. Now that's weighing evidence. Yes, sir. I mean, he did do that. Now, the other question that I have for you is the jurisdictional issue. Have we even had jurisdiction over this case because of that remand for the purpose of Voc Rehab? I did not think you did. You denied counsel's motion before I could weigh in originally. No, but in the interest of judicial economy, what would have happened is we would have went back, I would have again demanded for Voc Rehab, and the other side would have said, well, in Wayne's opinion, we disagree with Dr. Coyne and we take the position that he could return to full duties. He would have been denied Voc Rehab. I mean, generally, that's what would happen. I think counsel would agree that's exactly what would have happened. This has taken long enough. We're way over two years. There was a problem with this transcript to start with the because of the moving offices and stuff. So I just think in the judicial account, for that reason, you should weigh in on that. And if I could respond real quickly, and I did it in my brief, the reason for the differences for he did, you're correct, Your Honor, you're correct in that he did weigh in on the credibility. But you have to see he was not a treating orthopedic and never treated he and his original testimony from my original cross-examination. He was so intent on putting him back to work that he said he had no restrictions within eight weeks after the surgery. It was only till after redirect, he says, oh, yeah, I did make a mistake on that. He admitted that any more weight would accelerate the disease, the sedgmental adjacent sedgmental disease. He admitted that if there was a 30-pound weightlifting restriction, he could never return to heavy labor. I mean, his testimony was so incredulous and so obviously biased and based upon, I believe, I don't have the cases, I cited them in my brief, but I believe that it was proper for the court to more deference and to rule that certainly the more credible medical testimony was that of Dr. Coyle under the backdrop that this petitioner chose not one physician through all of this and also in the backdrop of the very serious, lengthy, complex nature of this type of surgery. Counsel, does anybody know whether that motion relating to jurisdiction was filed before or after the record was filed? Does anybody know the answer to that? I think it was filed before the record was filed, Your Honor. I think counsel immediately filed it. I don't know. You want me to respond? I think counsel took a good way in that. The motion was filed- Excuse me. Yes, sir. I think the answer is yes. Mr. Drinkwine could confirm whether it is yes. Yes. And so you either know or you don't. I think you're correct, sir. Okay. Okay, I see my light is gone. No, you're still green. You're still- Oh, I am. Still green. Oh, I'm sorry. Unless I missed it. No, this is my first time and I am so sorry. This is a little unnerving. No, that's fine. And the determinant, justice is correct. The determination was made, but it was made for those factors that was outlined by me and also outlined by Commissioner Parker. The 30-pound weightlifting restriction, that was never addressed by the majority of the commission. And that is a serious one, and that would have usurped all attempts on our part to get the vocational rehabilitation. I mean, we had the co-worker and the business agent testified that there is no way that he could return to heavy labor. Dr. Wayne testified the same thing, and that was set up. The demand was made. There was actually a vocational rehabilitation expert hired, but his report was stricken, as you can see from the record. I mean, this petitioner did everything possible. There's no evidence of any malingering. There's no evidence of anything. And again, I just want to reiterate the fact that I'm here under this set of facts. If it's a testimony of anything, it's a testament to my poor advocacy skills exhibited in this particular case. I would have never thought this would have meandered all the way to the appellate court and taken this long. Thank you. Thank you, sir. Any questions from the court? Further questions? No. Thank you, Mr. Unsell. Mr. Drinkwine, you may reply. Thank you, Judge. The motion for clarification of jurisdiction was filed immediately, and it would have been supported with a short record, as is required under the rules. That's my recollection. Some remarks about Mr. Unsell's arguments. I heard him say that the dissenters... When you say a short record, Mr. Drinkwine, you don't mean the record in the case. No, Judge. It would have been an appendix to the motion with the appropriate order of the circuit court. It seems that if the appeal to the circuit court had jurisdiction, then the appeal to this court, there must be jurisdiction for this court to review the circuit court's decision as well. Counsel, that doesn't follow. The fact that the circuit court had jurisdiction does not render whatever order the circuit court entered to be a final order. The question is, is the circuit court's order interlocutory or final based upon the language relating to vote rehab? That's the jurisdictional issue in a nutshell. Understood. There's no question the circuit court had jurisdiction. We don't have a problem with that. The problem is the question of jurisdiction, our jurisdiction, because of the question of arbitration. We identified that issue at the outset. Mr. Drinkwine, was vote rehab an issue before the arbitrator? Was it a raised issue or is it an issue that logically follows from findings an arbitrator would make? I think the latter, Judge. It logically follows. There wasn't a contested issue with respect to vocational rehabilitation in the arbitrator's order, if memory serves. If all of the quote elements necessary to receive vote rehab by the claimant are present and are found, then vote rehab logically would follow and is an entitlement for the claimant. Am I correct? Yes, with the exception of the fact that the commission disagreed and found that because he never intended to return to work under the Euclid case, vocational rehab is not appropriate. The commission did address vote rehab. Well, only in that paragraph citing the Euclid beverage case. They just said that the arbitrator's conclusion that he never intended to work also necessitates the denial of maintenance and vocational rehab. That was the end of that. That would be an inference that we would say that the commission found not the necessary and required findings elements to give an entitlement to vote rehab. That's your position, right? Right. It didn't dig into the merits of whether it was medically appropriate. Well, whether it's medically appropriate doesn't go to whether you're entitled to it. Is it? I mean, if the door is closed to vote rehab, if there's no intention to return to work, is that correct? Right. So that's the threshold. Okay. Let me ask this question. Once the commission found there was no entitlement to vote rehab because he didn't intend to return to work, was vote rehab an element that could be reexamined by the arbitrator under Thomas? Or could he only examine the question of additional TTD and the issue of permanency? I think the Thomas language would limit it to the latter. So in other words, the remand order by the circuit court telling the commission to and under supreme catering, the fact that the circuit court threw in the Thomas language is totally irrelevant to the question of finality of resort. I agree. Okay. But if any, I suppose could. No question. If any makes it a question for the commission to decide, as opposed to the circuit court telling them they had to do. Yes. I suppose a person could take the position that it's boilerplate language, but we are talking about the circuit court, so. Well, boilerplate language is still language, and it applies to a set of facts before the, you know, I mean, we can't just say, oh, it's boilerplate. I mean, it's language. It's ignored. Yeah. Well, I see your time is up, Mr. Drinkwine. Thank you, Mr. Drinkwine. Thank you, for your arguments in this matter.